# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**CRAIG HENNON,**                                    Case No. 1:19 CV 600

      Plaintiff,

      v.                                    Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                                    MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Craig Hennon ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 10). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB in January 2016, alleging a disability onset date of November 8, 2011. (Tr. 209-10). His claims were denied initially and upon reconsideration. (Tr. 100-03, 110-12). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 117-18). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on March 2, 2018. (Tr. 31-64). On April 27, 2018, the ALJ found Plaintiff not disabled in a written decision. (Tr. 15-23). The Appeals Council denied Plaintiff's request for review, making

the hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely filed the instant action on March 18, 2019. (Doc. 1).

**FACTUAL BACKGROUND**

Personal Background and Testimony

Born in 1974, Plaintiff was 43 years old on his date last insured. *See* Tr. 22, 209. He had previous work as a human resources manager, facilities manager, recording coordinator, and receiving coordinator. (Tr. 22, 36-38).

In a February 2016 function report, Plaintiff reported daily activities of getting his son ready for school, driving him to school, performing household chores, looking for work, picking up his son, preparing dinner, and putting his son to bed. (Tr. 261). He reported trying to "prepare several course meals" when his son was home; he made simple meals if he was alone. (Tr. 262). Plaintiff reported he could not sit for long periods of time, had difficulty bending, and had headaches that disrupted his sleep. (Tr. 260-61). Plaintiff left the house almost every day; he could drive, and went out alone. (Tr. 263). He reported difficulty being in crowds, so he ordered his groceries online and did other shopping as quickly as possible. *Id.* He visited his parents once or twice per week and tried to go to church every Sunday. (Tr. 264). He no longer went bowling due to his back problems. (Tr. 265). Plaintiff reported short term memory loss, and that he wrote down instructions so he would not forget things; he estimated he could pay attention for about an hour. *Id.* He did not handle changes well, finding himself "flustered and uncomfortable." (Tr. 266). He could walk for one-half mile before needing to rest. (Tr. 265).

At the time of March 2018 hearing, Plaintiff lived alone. (Tr. 39). He shared custody of his son with his ex-wife; his 9-year-old son (Tr. 47) lived with him every other week. (Tr. 39-40).

2

During a typical day, Plaintiff performed household chores (cooking, cleaning), and cared for his son. (Tr. 40).

Plaintiff testified that since his accident – where he fell from a walkway above a garage and hit his head – his short-term memory was "really bad"; he had difficulty remembering details from the previous day. (Tr. 41-42). He also did not like to be around unfamiliar people and avoided driving because he did not want to get hurt again. (Tr. 41). Plaintiff had difficulty concentrating and remembering what he needed to do for his son. (Tr. 51). Plaintiff also testified to difficulties with depression and anxiety, for which he took medication. (Tr. 47). He also took sleep medication, and medications for attention deficit hyperactivity disorder ("ADHD"). (Tr. 48-49). Anxiety caused his body to shake, and stomach problems. (Tr. 49). Plaintiff underwent a period without getting medical care due to depression. (Tr. 52) ("I didn't because the doctors weren't helping me and I got frustrated.").

Plaintiff also testified to ankle and back pain, which caused him to be unable to sit or stand for lengthy periods of time. (Tr. 41). Even before the accident, Plaintiff was limited to lighter lifting due to his dwarfism (Tr. 44); before he was able to lift and carry ten pounds, but after could not "walk with ten pounds in [his] hands" (Tr. 45). His back pain caused difficulty bending, and his back "stiffen[ed] up". *Id.* He also had ankle pain, shaking feet, and a numb, tingling sensation in his left hand. (Tr. 45-46). The hand numbness affected his ability to grip; this was worsening. *Id.* He estimated he could walk for ten to fifteen minutes before needing to rest due to ankle and back pain. (Tr. 46). After he stopped walking, it took ten to fifteen minutes for the pain to go away. (Tr. 51). He took Tylenol for his back pain, but no other prescribed pain medication. (Tr. 49).

<u>Relevant Medical Evidence</u>

In July 2011, on follow-up examination for ADHD, Plaintiff was found to have a short attention span with distractibility, forgetfulness, and depression symptoms including fatigue, depressed mood, and poor concentration. (Tr. 621). The provider continued Plaintiff's depression and ADHD medications. (Tr. 622).

Plaintiff was admitted to the hospital after suffering a head injury in November 2011. *See* Tr. 686-98. He fell from his parents' attic above the garage and sustained broken vertebra and a traumatic brain injury. *See* Tr. 930. He spent November 22 to December 7, 2011 in a rehabilitation center for his traumatic brain injury. *See* Tr. 430-51. He underwent speech therapy from December 2011 through January 2012. *See* Tr. 679-85.

In April 2012, Plaintiff saw Jeffrey J. Viscomi, M.D. (Tr. 795). He reported feeling well with no complaints, good energy, and was sleeping well. *Id.* Dr. Viscomi diagnosed, *inter alia*, ADHD and depressive disorder. (Tr. 796). In June and August, Dr. Viscomi made similar notes. *See* Tr. 791-94.

In November 2013, Plaintiff reported feeing well "with minor complaints." (Tr. 768). His physical examination revealed a normal gait, normal muscle tone, bulk, and strength, as well as full range of motion in all joints. (Tr. 769).

In December 2014, Dr. Viscomi repeated that Plaintiff felt well "with no complaints". (Tr. 747). His musculoskeletal examination again showed normal muscle tone, bulk, and strength, a normal gait, and full range of motion in all joints. (Tr. 748).

In April 2015, Plaintiff was not feeling well; his mood was improved, but he had insomnia and "continu[ed] to struggle with employment due to inability to sit down for any period of time

due to pain as well as difficulty with memory." (Tr. 745). In July and October, Dr. Viscomi again noted Plaintiff felt well, had no complaints, and had a good energy level. (Tr. 741, 743).

In December 2015, Plaintiff described symptoms such as difficulty concentrating, memory impairment, personality changes, emotional lability, depression, and sleep impairment. (Tr. 739). Plaintiff described these symptoms as "severe" and identified his short-term memory and concentration difficulties as most significant. *Id.* His symptoms were exacerbated by fatigue and emotional distress and relieved by mediation. *Id.* Dr. Viscomi continued medications (Adderall, Diovan, Zoloft, Lunesta, and Wellbutrin) and filled out disability forms. (Tr. 740). In January, Plaintiff reported feeling well with minor complaints (Tr. 733), and Dr. Viscomi noted normal bulk, tone, and strength in Plaintiff's muscles (Tr. 734). Plaintiff continued to have a normal gait and full range of motion in all joints. *Id.*

In January and March 2016, Plaintiff saw DeAnna Frye, Ph.D., on referral from Dr. Viscomi for an "assessment of neuropsychological functions following history of traumatic brain injury due to fall". (Tr. 930). Dr. Frye observed Plaintiff "ambulated independently in the office setting without the assistance of a device". *Id.* Dr. Frye's overall impression was "mildly diminished attention, anomia and visual perceptual defects as well as significant affective distress"; she listed diagnoses of mild neurocognitive disorder due to a traumatic brain injury, ADHD "by history", and dysthymic disorder. *Id.* Plaintiff told Dr. Frye that he was independent in his activities of daily living but reported fatigue. (Tr. 931). Dr. Frye administered various tests (Tr. 931-32), and noted Plaintiff demonstrated "evidence of mild impairment with regard to inattention, impulsivity and vigilance" (Tr. 932). She observed Plaintiff's showed "high average" performance on a measure of concentration and short- and long-term memory and an average processing speed. *Id.* His verbal functions, academic abilities, and language skills testing showed

average to high average scores. *Id.* His visual perception and reasoning skills were in the low average to borderline range. *Id.* He had some average to low average scores in memory testing. *Id.* In summary, Dr. Frye noted Plaintiff's full-scale IQ was within the average range. (Tr. 933). He had some variability, "suggesting a relative weakness with regard to his visual perceptive functions relative to working memory, a component of attention." *Id.* She explained that the "[r]esults of objective testing suggest[] difficulty with complex visual perceptual tasks, anomia and some very mild disruption of attention functions." *Id.* She noted Plaintiff was "able to reside independently in the community and care for his 6 year old son." *Id.* She concluded that her "assessment does not indicate any significant cognitive barriers at this time with regard to his ability to engage in competitive full time employment." *Id.* She further noted that Plaintiff "report[ed] significant daytime fatigue and limited endurance which would likely improve significantly if he were complaint with the recommended treatment for his sleep disorder." *Id.*

Plaintiff saw Dr. Viscomi in April and October 2017 reporting he felt well "with minor complaints"; he had good energy level and sleep. (Tr. 985, 1129). Dr. Viscomi continued Plaintiff on Zoloft and Wellbutrin for his depression, and Adderall for ADHD. (Tr. 986, 1130).

In December 2017, Plaintiff saw John Andrefsky, M.D., for a neurological evaluation; he reported memory loss, blurred vision, and headaches. (Tr. 1144-45). He reported "no difficulties with walking but he will get some back pain if he walks for a long period of time." *Id.* On examination, Dr. Andrefsky found Plaintiff had a "normal" attention span and ability to concentrate. (Tr. 1146). He was able to remember two out of three objects after five minutes. *Id.* Plaintiff also had a "stable" gait, and intact sensation. *Id.* Dr. Andrefsky ordered imaging and lab testing and instructed Plaintiff to follow up in three months. (Tr. 1147-48).

A December 2017 lumbar spine MRI showed chronic compression deformity in the mid and upper lumbar spine and marked narrowing of the spinal canal, lateral recesses, and neural foramina. (Tr. 1151).

In February 2018, Plaintiff saw Rish Goel, M.D., for a consultation regarding his brain MRI. (Tr. 1116). Dr. Goel noted Plaintiff was "not interested" in lumbar epidural injections because his symptoms were "not severe". *Id.* Dr. Goel noted Plaintiff's recent MRI "show[ed] enlarged ventricles." *Id.* Plaintiff's physical examination was unremarkable, including full upper and lower extremity strengths, intact sensation, and 2+ reflexes. (Tr. 1118). Dr. Goel opined that the enlarged ventricles on Plaintiff's MRI were "most likely hydrocephalus ex vacuo" and noted "[n]o acute neurosurgical intervention is needed." (Tr. 1120). He further observed that Plaintiff had back pain "but it [was] not severe" and again "[n]o acute neurosurgical intervention [was] needed." *Id.*

Plaintiff returned to Dr. Viscomi that same month reporting he felt well "with minor complaints"; specifically, he reported intermittent numbness in his left hand and chronic, intermittent low back pain. (Tr. 1126). Dr. Viscomi noted "[n]o physical findings today" regarding Plaintiff's hands, but noted he would consider an EMG/NCV if symptoms worsened. (Tr. 1127). Plaintiff had a normal gait, and normal muscle bulk, tone, and strength. *Id.* Dr. Viscomi continued Adderall for Plaintiff's ADHD; he also continued Wellbutrin, and changed the Zoloft dose for depression. *Id.*

In March 2018, Plaintiff returned to Dr. Frye for a re-evaluation. (Tr. 1164-68). Plaintiff reported increasing difficulty with his memory, as well as increased headaches. (Tr. 1165). In summary, Dr. Frye noted Plaintiff's full-scale IQ fell in the low-average range, and demonstrated a relative weakness with regard to processing speed. (Tr. 1167). His cognitive function was intact,

but he had deficits in attention consistent with his history of ADHD prior to his brain injury. *Id.* "Variable performance [was] seen across memory measures." *Id.* Dr. Frye noted a "significant decline" with regard to his processing speed index as compared to 2016, but "[a]ll other measures were essentially unchanged." *Id.* With regard to Plaintiff's ability to work, Dr. Frye noted his "cognitive impairments and emotional distress do represent barriers for return to gainful employment." (Tr. 1168). However, she noted, "with the appropriate accommodations he would be capable of at least part time competitive employment"; she recommended he contact Opportunities for Ohioans with Disabilities to request services and obtain both a functional capacity evaluation and a community-based assessment. *Id.*

*Opinion Evidence*

In December 2015, Dr. Viscomi opined Plaintiff had reached his maximum medical recovery point with his traumatic brain injury. (Tr. 808). He opined Plaintiff could stand/walk for less than one hour without back pain and fatigue; he could sit for two to three hours and lift 10 pounds occasionally. *Id.* He could use his hands for simple grasping, pushing, pulling, and fine manipulation. *Id.* He was unable to use his feet for repetitive movements as in operating foot controls, but could reach above shoulder level. *Id.* Plaintiff could occasionally bend, squat, crawl, and climb. *Id.* Dr. Viscomi opined Plaintiff's condition was stable, but that his mood and memory were "permanently impaired." *Id.* He further explained that Plaintiff "suffers from both mental & physical disabilities due to fall (in addition to congenital short stature)." *Id.*

In April 2016, State agency psychologist Joseph Edwards, Ph.D., reviewed Plaintiff's records and opined he could understand and remember one to four step tasks, and that he had moderate limitations in his ability to adapt, concentrate, and persist. (Tr. 76-77). That same month, State agency physician Gerald Klyop, M.D., opined Plaintiff could occasionally lift or carry 50

pounds and frequently carry 25. (Tr. 74-75). Dr. Klyop opined Plaintiff could sit, stand, or walk, for about six hours of an eight-hour workday, and that he had some postural limitations. (Tr. 75).

In June 2016, State agency psychologist Leslie Rudy, Ph.D., and State agency physician Michael Delphia, M.D., affirmed the earlier State agency opinions. (Tr. 91-94).

In February 2018, Dr. Viscomi completed a checkbox opinion form. (Tr. 1138-41). Therein, he cited Plaintiff's diagnoses of ADHD, post-traumatic brain syndrome, depression, and dwarfism. (Tr. 1138). He opined that Plaintiff's depression, dwarfism, and post-traumatic brain syndrome affected his physical conditions. (Tr. 1139). He opined Plaintiff could walk for three city blocks without rest or severe pain. *Id.* He could sit for two hours at one time, and two hours total in an eight-hour workday. *Id.* He could stand or walk for fifteen minutes at one time, for a total of less than two hours in an eight-hour workday. *Id.* Dr. Viscomi opined that Plaintiff needed to be able to shift positions at will and walk for five minutes every 60 minutes. *Id.* He further opined Plaintiff would need two to three unscheduled fifteen-minute breaks during a workday due to muscle weakness, chronic fatigue, and pain/paresthesias, numbness. *Id.* He believed Plaintiff could occasionally lift less than ten pounds, and rarely lift ten. (Tr. 1140). He could frequently twist, occasionally stoop, crouch, squat, or climb stairs, and never climb ladders. *Id.* Dr. Viscomi opined Plaintiff had significant limitations with reaching, handling, or fingering, but did not complete the section of the form asking him what percentage of the day Plaintiff could use his hands, fingers, or arms for various activities. *Id.* He opined Plaintiff would be off-task 25% or more of a workday, and was capable of low stress work. (Tr. 1141). Finally, Dr. Viscomi opined Plaintiff's impairments (as demonstrated by signs, clinical findings, and laboratory results) were reasonably consistent with the symptoms and functional limitations in his opinion. *Id.*

In March 2018, Dr. Viscomi wrote a letter in which he stated:

My office medical records indicated that Craig is doing well but that statement should be put into perspective. Craig is doing well for a person born with Achondroplasia (Dwarfism) and who suffered a serious TBI from a fall through his attic onto the garage floor. He also broke several vertebrae and ribs in that fall. He is making a major effort, which has been very difficult to put all that behind him. He has serious physical and mental limitations because of his inherent skeletal dysplasia and these limitations have been compounded by his injury. I hope this clarifies what I was referring to in my office records.

(Tr. 1162).

VE Testimony

A VE testified at the hearing before the ALJ. (Tr. 52-59). The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, work experience, and residual functional capacity ("RFC") as ultimately determined by the ALJ. *See* Tr. 53-55. The VE responded that such an individual could perform Plaintiff's past work as a check cashier, and could also perform other jobs such as surveillance system monitor, order clerk, and inspector. (Tr. 55).

ALJ Decision

In his April 27, 2018 written opinion, the ALJ found Plaintiff met the insured status requirements for DIB through March 31, 2018, and had not engaged in substantial gainful activity from his alleged onset date of May 5, 2013 through his date last insured. (Tr. 17). He found Plaintiff had severe impairments of obesity, congenital anomalies, attention deficit disorder/attention deficit hyperactivity disorder, organic mental disorder, and affective disorder, *id.*; however, none of these impairments – individually or in combination – met or medically equaled the severity of a listed impairments (Tr. 18). The ALJ then determined Plaintiff retained the RFC

to perform sedentary work as defined in 20 CFR 404.1567(a) except that the claimant can occasionally use foot controls with the bilateral feet. He can frequently stoop, kneel, and crouch and occasionally crawl and climb ramps and stairs but never climb ladders, ropes, or scaffolds. He can frequently handle and finger objects with the left, dominant hand. He must avoid moving machinery, unprotected heights, and commercial driving. He is limited to unskilled (SVP 1-2) work in an environment free of fast-paced production requirements and involving only routine

workplace changes. He can have superficial contact with others, whereas he can do no[] tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others, or being responsible for the safety or welfare of others.

(Tr. 19). Based on Plaintiff's age, education, work experience, and RFC, the ALJ found Plaintiff was not capable of performing his past relevant work, but was capable of performing other jobs that existed in significant numbers in the national economy. (Tr. 22). Therefore, the ALJ found Plaintiff not disabled from May 5, 2013 (his alleged onset date) through March 31, 2018 (his date last insured). (Tr. 23).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by

11

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

Plaintiff objects to the ALJ's consideration of the opinion evidence. Specifically, he contends the ALJ erred in his evaluation of Dr. Viscomi's February 2018 opinion and in his analysis of Dr. Frye's 2016 and 2018 opinions.

*Dr. Viscomi*

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188.[1] A treating physician's opinion is given "controlling weight" if it is supported by (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, she must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* (quoting SSR 96-2p, 1996 WL 374188, at *4). When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r*

---

1. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819. Plaintiff filed his claim in January 2016 and thus the previous regulations apply.

*Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

An ALJ's brief explanation may satisfy the good reasons requirement, if that brief analysis touches on the required factors. *See Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009). However, a conclusory statement that a treating physician's opinion is inconsistent with the record is insufficient to satisfy the rule. *See Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010). "Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." *Id.* at 552.

The ALJ explained his consideration of Dr. Viscomi's opinion as follows:

I cannot give controlling weight to the opinion of Jeffrey Viscomi, M.D. because, despite him having an ongoing, established relationship with the claimant based on years of treatment, Dr. Viscomi is a mere primary physician providing an opinion significantly limiting the claimant, which is not consistent with his own treatment notes in the records; thus I give it only little weight here. Indeed, the claimant was prescribed a medication regimen for the claimant that remained fairly consistent with only periodic and slight adjustments made to brand and dosage of the medication, and absolutely no side effects reported or noted. Progress notes indicate that the claimant is doing "well" based on an effective and beneficial medication regimen. (8F/2, 10, 12, 14, 16, 22; 12F/3; 15F/2; 16F/3; 17F/3; 18F/3; 21F/3; 23F/1; 25F/3-4).

I do acknowledge that Dr. Viscomi did offer an explanation at 28F that his notation that the claimant is doing well "should be put into perspective," as the claimant

continues to have "serious physical and mental limitations because of his inherent skeletal dysplasia and these limitations have been compounded by his injury." I have reduced the claimant's level of exertion to "light" to give adequate consideration to the claimant's congenital anomalies (achondroplasia) and further reduced his residual functional capacity based on the claimant's more recent complaints of numbness in his left hand (25F/3) and his known left foot drop (27F/7), though the claimant has repeatedly been found to maintain normal strength, tone, reflexes, sensation, coordination, and fine motor skills with negative Phalen's and Tinel's and no abnormalities in heel or toe walk or gait. (8F; 11F/4; 24F/4; 25F/4; 27F/5). And, it is important to note that the claimant has complained of back pain that is due to compression deformity with spinal stenosis (27F/10) but that further reduction in residual functional capacity is not supported but "it is not severe" (24F/6), as the claimant denies signs of lumbar stenosis, leg numbness, tingling, and weakness, and bowel or bladder issues, refused the recommendation of an lumbar epidural steroid injection (24F/2), is not a candidate for neurosurgical intervention (24F/6), and has neither sought nor received any sort of consistent, specialized treatment for such complaints.

(Tr. 21).

The undersigned finds that this explanation provides the required "good reasons" to discount Dr. Viscomi's opinion as it is supported by substantial evidence and touches on multiple factors required by the regulations.

First, although Plaintiff objects to Dr. Viscomi being labeled a "mere primary physician" (Tr. 21), this statement speaks to one of the required regulatory factors – the specialization of the treating source. 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist."). Moreover, in the same sentence, the ALJ acknowledged that Dr. Viscomi's "ongoing, established relationship" (Tr. 21) with Plaintiff weighed initially in favor of his opinion, again addressing a required regulatory factor. *See* 20 C.F.R. § 404.1527(c)(2)(i)-(ii) (factors of length and nature of treatment relationship).

Second, the ALJ noted Dr. Viscomi's "significantly limiting" opinion was "not consistent with his own treatment notes." (Tr. 21). Plaintiff objects, stating that the ALJ "does not cite specific

examples of inconsistencies in this respect". (Doc. 12, at 14). But the ALJ did just that – at the end of the same paragraph, and continuing into the next. *See* Tr. 21. He first cited Dr. Viscomi's consistent progress notes that Plaintiff was doing "well". (Tr. 21) (citing Tr. 733, 741, 743, 745, 747, 753, 940, 968, 973, 977, 985, 1100, 1111, 1126). The ALJ then acknowledged Dr. Viscomi's letter explaining that these statements "should be put into perspective" and that Plaintiff had "serious physical and mental limitations because of his inherent skeletal dysplasia and these limitations have been compounded by his injury." (Tr. 1162). But as quoted above, the ALJ then provided a reasoned explanation, citing evidence of record (both within Dr. Viscomi's treatment notes and elsewhere in the record), for why he reduced Plaintiff's RFC to the level he found and not further. (Tr. 21). The undersigned finds the ALJ reasonably determined that findings of normal gait, strength, tone, reflexes, sensation, and coordination, as well as a statement that Plaintiff's back pain was "not severe" were inconsistent with Dr. Viscomi's extremely limiting opinion. *See* Tr. 732-99 (Dr. Viscomi's treatment notes from May 2014 to January 2016, which show either no musculoskeletal physical findings or normal findings); Tr. 930 (Dr. Frye's observation that Plaintiff ambulated independently); Tr. 1118 (Dr. Goel's normal physical examination findings); Tr. 1127 (Dr. Viscomi's normal musculoskeletal findings in February 2018); Tr. 1146 (Dr. Andrefsky's finding of "stable" gait). That is, the findings listed, combined with Dr. Viscomi's repeated statements that Plaintiff was doing "well" provide substantial evidence to undercut Dr. Viscomi's limiting opinion that Plaintiff, *inter alia*, could only sit for a total of two hours per day, needed to shift positions at will, required breaks due to muscle weakness, chronic fatigue, or pain, and would be off-task due to severe symptoms for twenty-five percent of a workday. *See* Tr. 1139. The ALJ thus addressed the consistency of Dr. Viscomi's opinion with the other evidence of record, as required by the regulations. *See* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion.").

Third, the ALJ accurately noted that Plaintiff's medications remained fairly steady "with only periodic and slight adjustments" and noted that Plaintiff had "neither sought nor received any sort of consistent, specialized treatment" for his complaints of back pain. (Tr. 21). Plaintiff's fairly consistent and modest treatment regimen is a valid reason to discount a treating physician opinion. *See, e.g.*, *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 631 (6th Cir. 2016) ("The ALJ noted that the records indicate Kepke received only conservative treatment for her ailments, a fact which constitutes a 'good reason' for discounting a treating source opinion"); *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 806 (6th Cir. 2011) ("the ALJ reasonably viewed Francis's limited treatment as inconsistent with Dr. Wakham's opinion").

Finally, Plaintiff objects that "there is no other credible and competing medical opinion upon which to rely and which detracts from the credibility of Dr. Viscomi's opinion" because the State agency opinions were rendered in 2016 and the ALJ did not order a consultative examination. (Doc. 12, at 14-15). But "[t]he responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009); *see also Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442-43 (6th Cir. 2017) ("An RFC is an 'administrative finding,' and the final responsibility for determining an individual's RFC is reserved to the Commissioner."). An ALJ's RFC determination must be supported by evidence of record, but it need not correspond to, or even be based on, any specific medical opinion. *See Brown v. Comm'r of Soc. Sec.*, 602 F. App'x 328, 331 (6th Cir. 2015); SSR 96-5p, 1996 WL 374183, at *5 ("Although an adjudicator may decide to adopt all of the opinions expressed in a medical source statement, a medical source statement must not be equated with the administrative finding known as the [RFC] assessment."). Instead, it is the ALJ's duty to formulate the RFC based on all the evidence in the record. *Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 583,

587 (6th Cir. 2013); *see also Poe*, 342 F. App'x at 157 ("Moreover, an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding."). The ALJ did just that here – considered all the evidence of record, opinion and otherwise, and formulated a physical RFC that was more restrictive than that offered by the State agency physician opinions (*see* Tr. 22), and less restrictive than that offered by Dr. Viscomi (*see* Tr. 21). To do so was not error. *See, e.g.*, *Poe*, 342 F. App'x at 157. The ALJ found Plaintiff significantly limited – to sedentary exertional work, with further postural restrictions and restrictions on the use of his hands and feet. *See* Tr. 19.

The undersigned concludes that Plaintiff has not shown error in the ALJ's treatment of Dr. Viscomi's opinion. The ALJ considered the required factors, provided the required "good reasons", and his decision to discount Dr. Viscomi's opinion is supported by substantial evidence.

### Dr. Frye

For medical opinions from non-treating physicians, an ALJ is to consider the same factors as with treating physicians. *See* 20 C.F.R. § 404.1527(c) ("[W]e consider all of the following factors in deciding the weight we give to any medical opinion"). While "an opinion from a medical source who has examined a claimant is [generally] given more weight than that from a source who has not performed an examination," ALJs have more discretion in considering non-treating source opinions. *Gayheart*, 710 F.3d at 375. Notably, they need not give "good reasons" for discounting non-treating source opinions. *See Martin v. Comm'r of Soc. Sec.*, 658 F. App'x 255, 259 (6th Cir. 2016) ("But because Dr. Rutledge and Dr. Joslin are non-treating sources, the reasons-giving requirement is inapplicable to their opinions."); *see also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) ("[T]he SSA requires ALJs to give reasons for only treating sources."). ALJs are not required to defer to opinions of non-treating sources and must only provide a

meaningful explanation regarding the weight given to particular medical source opinions. *See* SSR 96-6p, 1996 WL 374180, at *2 ("Administrative law judges and the Appeals Council are not bound by findings made by State agency or other program physicians and psychologists, but they may not ignore these opinions and must explain the weight given to the opinions in their decisions.").

Dr. Frye examined Plaintiff twice, but did not have an ongoing treatment relationship. The ALJ addressed her two opinions as follows:

> Turning my attention to the neuropsychological examinations from January and March 2016, I find that the resulting opinion from DeAnna Frye, Ph.D. that there was no indication "of significant cognitive barriers ... with regard to his ability to engage in competitive full time employment" (11F/7) warrants great weight, as it is consistent with Dr. Frye's own clinical observations and findings. In fact, although the claimant was found to have "mildly" diminished attention, anomia, and visual perceptual deficits as well as significant affective distress (l 1F/4), his level of intelligence was still fell in the average range (11F/7-8) and he was alert and oriented with normal speech, logical, coherent, and goal-directed thought processes, no suicidal or homicidal ideations, and only mildly anxious mood (11F/4). I also cannot disregard the fact that, at the time of Dr. Frye's opinion, the claimant himself was confident in his ability to return to work considering he was active with Opportunities for Ohioan's [sic]with Disabilities (OOD) and seeking employment. (*see* 11F/5). Dr. Frye's findings and opinion are further supported by findings preceding and following Dr. Frye's opinion; the claimant was repeatedly noted as alert, oriented, and cooperative (8F/3, 9, 11, 13, 15, 17, 22, 26, 30, 32, 37-38, 41; 12F/4; 15F/3; 16F/4; 17F/4; 18F/4; 21F/4; 23F/2) and, once a medication regimen was established through the claimant's primary physician, having improved mood, energy, and sleep (7-8 hours per night) (8F/2, 10, 12, 14, 16, 22; 12F/3; 15F/2; 16F/3; 17F/3; 18F/3; 21F/3; 23F/1; 25F/3-4). Further lending support to Dr. Frye's opinion is the fact that, after undergoing neurologic examinations in December 2017 and February 2018, the claimant exhibited only "mild" memory loss" (27F/7) and, even with a magnetic resonance imaging (MRI) scan showing an enlarged ventricle (24F/5), which was determined to be hydrocephalus (27F/12), the claimant denied associated symptoms (24F/2, 6) and it was determined that there was no need for intervention (24F/6).
>
> On the other hand, I do note that the claimant, after undergoing another neuropsychological examination in March 2018 with Dr. Frye, was found to have significant decline in processing and visual speeds as well as scanning (29F/5) that resulted in Dr. Frye limiting the claimant to part-time competitive employment (29F/6) but I cannot fully accept this opinion because it is actually internally inconsistent. For example, Dr. Frye also noted that the claimant's "current pattern of performance does not suggest the presence of a neurodegenerative process ..."

(29F/5) and, because she recommends a functional capacity evaluation (FCE) and community-based assessment (29F/6), it is not unreasonable to assume that Dr. Frye did not consider herself the best provider to give such opinion. I also cannot ignore that Dr. Frye, though observing the claimant as having extremely low attention with impaired memory, he still maintained average intelligence and comprehension with only "mildly" depressed mood. (29F/2, 4-5).

(Tr. 20-21).

The undersigned finds the ALJ's explanation of the weight assigned to these two opinions supported by substantial evidence. Again, the ALJ is not required to give "good reasons" for his assessment of these non-treating physician opinions, but rather to explain the weight assigned. *See* SSR 96-6p, 1996 WL 374180, at *2. First, the ALJ assigned great weight to the 2016 opinion finding it consistent with the evidence. Plaintiff does not directly take issue with this, but argues that "[t]he ALJ fail[ed] to include in his rationale that Dr. Frye based her opinion solely on the cognitive aspect of Plaintiff's case" and "Dr. Frye clearly stated that Plaintiff's physical barriers will impact his ability to be gainfully employed" (Doc. 12, at 15) (citing Tr. 933). But Dr. Frye did not state exactly this, rather, she said:

The current assessment does not indicate any significant cognitive barriers at this time with regard to his ability to engage in competitive full time employment. Testing does reveal the presence of affective distress which appears to represent a mild level of impairment with regard to his functional activity pattern. He reports significant daytime fatigue and limited endurance which would likely improve significantly if he were compliant with the recommended treatment for his sleep disorder. Craig may have physical barriers that will impact his ability to engage in gainful employment; however, this is not within the scope of neuropsychological assessment and should be deferred to his treating physician.

(Tr. 933). The undersigned agrees with the Commissioner that "[i]t is inconceivable that an ALJ would be required to discuss what an opinion was *not* about." (Doc. 14, at 10) (emphasis in original). That is, the ALJ did not err by failing to note that Dr. Frye opined that Plaintiff "may have" physical problems, but that her opinion did not address such problems.

Furthermore, the undersigned finds no merit to Plaintiff's contention that the ALJ erred in his statement that "at the time of Dr. Frye's evaluation, Plaintiff himself was confident in his ability to return to work, considering he was active with the Opportunities with Ohioan's [sic] with Disabilities and seeking employment." (Tr. 20) (citing Tr. 931). First, although Plaintiff asserts this is a reason provided by the ALJ for rejecting Dr. Frye's 2018 opinion, the proffered explanation is actually contained within the ALJ's rationale for providing great weight to Dr. Frye's 2016 opinion. *See* Tr. 20. That is, the ALJ reasonably explained that Plaintiff's attempts to return to work were consistent with Dr. Frye's 2016 opinion that Plaintiff did not have any cognitive barriers to returning to work. *See id.*

Turning to the ALJ's consideration of Dr. Frye's 2018 opinion, the undersigned similarly finds no error. The ALJ's rationale for discounting this opinion was that it was "internally inconsistent". (Tr. 20). This was so, he explained, because although Dr. Frye opined that Plaintiff had cognitive impairments and emotional distress that were barriers to gainful employment, "with the appropriate accommodations he would be capable of at least part time competitive employment", she also stated that "in order to fully assess his work abilities", he should contact Opportunities for Ohioans with Disabilities, undergo a functional capacity evaluation, and a community-based assessment. (Tr. 1168). The ALJ explained that, given these recommendations, "it is not unreasonable to assume that Dr. Frye did not consider herself the best provider" to give an opinion on Plaintiff's abilities to work. (Tr. 21). Dr. Frye specifically noted that a "community based assessment [would] provide information about basic work skills including endurance, ability to interact with coworkers, attendance and ability to follow through with instructions." (Tr. 1168). Although the undersigned agrees with Plaintiff that "[r]eferring a patient out for other testing or another resource[] in no way diminishes her opinion", the ALJ's reading of Dr. Frye's conclusion

– to suggest that she did not believe herself to be the appropriate person to determine Plaintiff's work capabilities – is a reasonable one.

To repeat, an ALJ is not required to provide "good reasons" for discounting a non-treating source opinion, but rather "must explain the weight given to these opinions." SSR 96-6p, 1996 WL 374180, at *2; *see also Martin*, 658 F. App'x at 259; *Smith*, 482 F.3d at 876. The undersigned finds the ALJ's explanation of his consideration of Dr. Frye's opinions sufficiently well-explained and supported by substantial evidence. In the previous paragraph, the ALJ explained that Dr. Frye's initial opinion that Plaintiff could work was "further supported by findings preceding and following Dr. Frye's opinion" that Plaintiff was repeatedly noted to be alert, oriented, and cooperative, as well as having an improved mood and energy once Dr. Viscomi established a stable medication regimen. (Tr. 20) (citing Tr. 733-34, 740-48, 753, 757, 761, 763, 768-69, 772, 940-41, 968-69, 973-74, 977-78, 985-86, 1100-01, 1111-12, 1126-27). Furthermore, the undersigned notes the ALJ included significant mental restrictions in the RFC. *See* Tr. 19 (limiting Plaintiff to "unskilled (SVP 1-2) work in an environment free of fast-paced production requirements and involving only routine workplace changes"; "can have superficial contact with others, whereas he can do no[] tasks involving arbitration, negotiation, confrontation, directing the work of others, persuading others, or being responsible for the safety and welfare of others."). For these reasons, the Commissioner's decision will be affirmed.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB supported by substantial evidence and affirms that decision.

s/ James R. Knepp II
United States Magistrate Judge